U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2023 APR 21  PM 3: 29

CLERK

BY _____
DEPUTY CLERK

SHAWN MCCULLOUGH,       )
                        )
    Plaintiff,          )
                        )
    v.                  )       Case No. 2:20-cv-00170
                        )
FEDERAL EXPRESS CORPORATION,  )
                        )
    Defendant.          )

**OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 52)

Plaintiff Shawn McCullough ("Plaintiff") brings this action against Defendant Federal Express Corporation ("Defendant") alleging that Defendant terminated his employment in retaliation for filing three wage claims with the Vermont Department of Labor and submitting three internal complaints to Defendant, in violation of 21 V.S.A. ch. 5, subchapter 2 and Vermont's Fair Employment Practices Act ("VFEPA"), 21 V.S.A. §§ 495-496a.

Pending before the court is Defendant's motion for summary judgment. (Doc. 52.) Plaintiff responded on July 18, 2022 (Doc. 55), and Defendant filed its statement of undisputed material facts on August 16, 2022. (Doc. 60.) Plaintiff filed a revised response in opposition on August 29, 2022. (Doc. 61.) Defendant replied on September 7, 2022. (Doc. 63.) The court held a hearing on October 27, 2022, after which it took the pending motion under advisement.

Plaintiff is represented by Norman E. Watts, Jr., Esq. Defendant is represented by Elizabeth K. Rattigan, Esq., and Gabriel P. McGaha, Esq.

## I.     Undisputed Facts.[1]

Plaintiff first began working for Defendant in 1988 as a part-time courier in

Kentucky. After approximately two years he transferred to Iowa, where he worked as a

courier until 2000, when he left to take employment elsewhere. In September 2010,

Defendant rehired Plaintiff to work as a part-time courier at Defendant's Williston,

Vermont station ("BTVA").

Plaintiff's employment with Defendant was at-will. In his application for the

BTVA courier position, Plaintiff acknowledged that he had received a copy of

Defendant's Employee Handbook and read the following statement:

> That during the term of my employment, which I understand is
> INDEFINITE IN DURATION, I will comply with guidelines established in
> the Company's policies, rules, regulations, and procedures. I acknowledge
> and agree that [Defendant] has the absolute unfettered right to change its
> policies, rules, regulations, and procedures unilaterally at any time, without
> prior notice. I ALSO AGREE THAT MY EMPLOYEMNT AND
> COMPENSATION CAN BE TERMINATED WITH OR WITHOUT
> CAUSE AND WITHOUT NOTICE OR LIABILITY, WHATSOEVER,
> AT ANY TIME.

(Doc. 60 at ¶ 4) (emphasis in original).

Defendant's "Acceptable Conduct Policy" provides employees with specific

guidance regarding workplace standards and consequences for misconduct. Pursuant to

the Acceptable Conduct Policy, managers may issue an "Online

---

[1] Plaintiff's Revised Statement of Disputed Facts (Doc. 61-1) both responds to Defendant's Statement of Undisputed Material Facts (Doc. 60) and contains additional facts which Plaintiff contends are disputed. The Local Rules do not authorize the nonmoving party to submit additional uncontested facts. *See* LR 56(b) ("A party opposing summary judgment . . . must provide a separate, concise statement of *disputed* material facts.") (emphasis supplied); *see also Post v. Killington, Ltd.*, 2010 WL 3323737, at *1 (D. Vt. Mar. 23, 2010) ("The Rule does not contemplate the filing of a statement of undisputed facts by the non-moving party."); *Schroeder v. Makita Corp.*, 2006 WL 335680, at *3 (D. Vt. Feb. 13, 2006) ("[T]he Local Rules do not provide an opportunity for the nonmoving party to file a statement of *undisputed* facts at the summary judgment stage."). However, because Defendant has not moved to strike Plaintiff's Revised Statement of Disputed Facts and has responded to it, the court will consider it in resolving the pending motion. *See Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 276 (D. Vt. 2013) (noting that the court may consider "any additional facts that [are] both integral to the parties' arguments and undisputed").

Compliment/Counseling" ("OLCC") to provide feedback on an employee's performance. An OLCC is not a disciplinary measure and may include positive performance feedback. Defendant may consider an employee's OLCC record to identify behavioral patterns and to determine appropriate disciplinary measures. An OLCC may consist of a "Warning Letter," a "deficiency" notification that remains "active" for the twelve-month period following the letter's issuance date. (Doc. 52-6 at 4-5.) Receiving three Warning Letters within twelve months is grounds for termination. Plaintiff was aware of this policy.

From 2010 to 2016, Plaintiff received OLCCs with both positive and negative feedback and performance evaluations. In February 2015, Plaintiff received a Warning Letter for violating the Acceptable Conduct Policy after a customer contacted the BTVA station about a confrontation he had with Plaintiff during a delivery attempt in which Plaintiff told the customer that he "didn't have to be such an idiot about it." (Doc. 52-8 at 1) (emphasis omitted). On June 18, 2015, Operations Manager Angel Lane suspended Plaintiff with pay pending an investigation of the incident. Plaintiff has admitted that, at times, he loses his temper when he is angry, although he maintains he gets along well with his co-workers.

On June 27, 2016, Defendant offered Plaintiff a position as a full-time courier at BTVA and Plaintiff accepted the offer. Plaintiff bid for and was assigned Route 745. Defendant's letter confirming Plaintiff's assignment to the route stated, "Your route runs Monday-Friday 0800-1700. These hours are subject to change to meet the business needs of the company." (Doc. 52-11 at 1.) Plaintiff's route covered primarily rural areas, including the Lake Champlain islands in Grand Isle County, Vermont.

While Plaintiff was employed by Defendant, Defendant's break policy varied between requiring couriers to take a daily thirty-minute break and a sixty-minute break based on Defendant's business needs. Although Plaintiff contends Defendant applied its policy "inconsistently" (Doc. 61-1 at 6, ¶ 71), the evidence he cites indicates that Defendant's Managing Directors announced the break lengths for all workers based upon Defendant's business needs. He concedes that supervisors did not have authority and did not alter the break policy the Managing Director set.

In 2013, when Plaintiff was a part-time courier, Plaintiff received five OLCCs notifying him that he had failed to take the required sixty-minute break on July 8, July 11, and August 6, 2013; March 14, 2014; and March 4, 2015.

After Plaintiff became a full-time courier, in January 2017 Defendant changed its policy for BTVA to require couriers who drove longer than eight hours to take a sixty-minute break, although BTVA management could and did approve exceptions to the sixty-minute requirement. Even when the break policy required a thirty-minute break, Plaintiff estimates that he did not take a break ninety-five percent of the time, although he would usually log that he had taken a break.

In August 2014, Plaintiff successfully filed a wage claim with the Wage and Hour Unit of the Vermont Department of Labor (the "August 2014 Wage Claim") in an unidentified amount. On February 28, 2017, he filed a claim for $276.75 in unpaid wages (the "February 2017 Wage Claim"), claiming that Defendant failed to pay him for fifteen hours of wages pursuant to its minimum weekly guarantee policy. This claim was also successful.

In March 2017, Plaintiff received OLCCs for failing to take a sixty-minute break on March 3, March 6, March 7, and March 8, 2017. On April 27, 2017, at the suggestion of Senior Manager John Frimodig, Plaintiff submitted an "Open Door Inquiry" letter to Defendant's Human Resources team explaining his opposition to BTVA's break policy. In the letter he wrote:

> [A]ccording to Vermont statute at 21 V.S.A. §[]304, the purpose of a break is to ". . . provide an employee with reasonable opportunities during work periods to eat and to use toilet facilities in order to protect the health and hygiene of the employee." Clearly, breaks are purposed by law for the employees' benefit (i.e., health and hygiene), not as a means for employers to coerce productivity, circumvent compensation, or manipulate statistical data. If any mandate in [Defendant]'s break policy creates a detriment to the employee, such that it diminishes a lawfully intended benefit, then it tends to violate the spirit—if not the letter—of Vermont's law.

(Doc. 52-15 at 1-2.) Approximately two weeks later, on May 11, 2017, District Manager Director Daniel Doherty replied to Plaintiff's Open Door Inquiry, stating that BTVA

4

management had discretion to allow exceptions to the sixty-minute break policy.

On October 20, 2017, Plaintiff sent a memorandum to Operations Manager Jared Norris, in which he wrote:

> As discussed at length with FedEx management, I have serious legal and ethical concerns regarding the inequity of a mandated [one] hour meal-break policy for couriers at station BTVA. Consequently, complicity in adherence to said policy creates an ethical conflict to which I am, in good conscience, unable to yield.

(Doc. 52-17 at 1.)

On November 15, 2017, Mr. Norris issued a Warning Letter (the "first November 2017 Warning Letter") to Plaintiff for failing to comply with the sixty-minute break policy on six days in October. Mr. Norris suspended Plaintiff with pay while Defendant investigated Plaintiff's violations. Plaintiff challenged the first November 2017 Warning Letter through Defendant's internal appeal process, and Defendant upheld Mr. Norris's decision to issue the letter. On November 21, 2017, Plaintiff received another Warning Letter (the "second November 2017 Warning Letter") for violating the sixty-minute break policy during a "checkride" with his manager. (Doc. 52-19 at 1.) Plaintiff appealed the second November 2017 Warning Letter and Defendant modified it to a "documented counseling." *Id.* at 5.

On May 20, 2019, Plaintiff received a Warning Letter for not completing deliveries as directed (the "May 2019 Warning Letter"). Plaintiff appealed the May 2019 Warning Letter and Defendant upheld its decision. On July 3, 2019, Plaintiff received a Performance Reminder/Decision Day for failing to comply with the break policy on July 1, 2019. Plaintiff appealed the Performance Reminder/Decision Day, and Defendant modified it to a Warning Letter because "[a]t the [internal appeal process] Step 1 hearing, it was determined that the issue for which [Plaintiff] was being disciplined was a result of conduct not performance[]" (the "July 2019 Warning Letter"). (Doc. 60 at 8, ¶ 46.) Plaintiff appealed the issuance of the July 2019 Warning Letter (the "July 2019 Appeal Letter"), but Defendant upheld its decision to issue the letter.

On July 17, 2019, Plaintiff re-submitted his April 2017 Open Door Inquiry letter

to Human Resources contesting the sixty-minute break policy (the "July 2019 Open Door Inquiry"). Defendant responded to the letter on July 19, 2019, explaining the break's purpose and stating that local management had the discretion to grant exceptions to the sixty-minute break policy "when business conditions can support them." (Doc. 52-23 at 1.) Defendant's Open Door Policy provides that "an employee may only submit one Open Door on any particular concern." (Doc. 63-4 at 2.)

On July 31, 2019, Plaintiff submitted a claim with the Vermont Department of Labor for $5,029.04 in wages which he claimed Defendant owed him for working 181 hours during unpaid breaks between August 11, 2017 and August 9, 2019 (the "July 2019 Wage Claim"). His claim asserted:

> For at least the past two (2) years (8/1/17-8/1/19), and largely in order to meet [Defendant's] customer service commitments, I have routinely worked through unpaid break periods of 30 minutes duration each worked day. [Defendant's] management has had constructive–and often actual–notice of the occurrences of said unpaid breaks being worked, but have made no overture to compensate me for it.

(Doc. 52-24 at 4.) Plaintiff quoted the Fair Labor Standards Act as stating, "Work not requested but suffered or permitted is work time . . . [t]he reason is imm[a]terial." *Id.* Defendant responded to Plaintiff's July 2019 Wage Claim on September 6, 2019 and asserted that Plaintiff was seeking payment for time he had recorded as breaks on his time card.

After filing the July 2019 Wage Claim, Plaintiff continued to disregard the break policy. On August 27, 2019, BTVA Senior Manager John Martin met with Plaintiff to discuss the break policy's requirements. Thereafter, Plaintiff did not alter his practice of disregarding the break policy. Between January and August 2019, Defendant issued Plaintiff eighteen OLCCs for violating the break policy.

Approximately seven weeks after Plaintiff filed the July 2019 Wage Claim, on September 13, 2019, Defendant issued Plaintiff a Warning Letter for violating the break policy on September 13, 2019 (the "September 2019 Warning Letter") and terminated Plaintiff's employment. Plaintiff appealed the September 2019 Warning Letter and his

termination through Defendant's internal process. Defendant upheld both decisions.

Plaintiff was never disciplined for failing to finish his route on time. He admits he consistently drove through his breaks whether they were thirty or sixty minutes. Defendant's employee and Plaintiff's co-worker, Stephen Kolinich, provided deposition testimony that although he had not worked through his break, when couriers were unable to take a full sixty-minute break, they "had to call [their] manager and get authorization." (Doc. 52-27 at 9.) He had heard other couriers state they had worked through lunch breaks, but had never heard that a courier had received a "letter or some sort of caution because he had worked through the break." *Id.* at 21.[2] Fellow courier and employee Justin Denoyers testified that he could not remember ever having worked through his break, and that although he had heard other couriers say that they had done so,[3] it was not "a frequent occurrence." (Doc. 61-7 at 9.)

In affidavits provided by three current or former full-time couriers (John Graves, Joshua Brueckner, and Kyle Conger) employed by Defendant, each averred that there were "regular occasions during the course of [their] employment with [Defendant] through which [they] have worked unpaid *Meal/Rest Break* periods, in order to meet [Defendant's] on-road and customer service expectations." (Doc. 61-11 at 2-4) (emphasis in original). The affidavits do not state whether Mr. Graves, Mr. Brueckner, or Mr. Conger received permission to work through their breaks or whether they were disciplined for doing so.

## II.    Disputed Facts.

Although Plaintiff asserts that Defendant applied its break policy unevenly, he identifies no evidence of disparate treatment of other couriers. He asserts that Defendant was aware of couriers driving through their breaks because its delivery trucks were equipped with trackers that recorded driving time, however, the deposition testimony of

---

[2] Although this appears to be inadmissible hearsay, as neither party challenges it, any objection is waived for the purposes of the pending motion.

[3] *See* n.3.

7

Mr. Kolinich which he cites in support of this claim does not support it:

> Q. I was under the assumption that there were – there was a time, back in pre-COVID times, when you did work through a lunch break because of the load of packages to be delivered. Is that erroneous?
>
> A. That I did?
>
> Q. Yes, sir?
>
> A. I don't remember that, no. I tried not to – I tried to take my full-hour break, even now I try to take my full-hour break, but I don't remember working through a lunch break.
>
> Q. I see. Well, the full-hour break, if we refer to the full-hour break, are there times when you are unable to take the full-hour break?
>
> A. Now?
>
> Q. Yes?
>
> A. Yes, there are certain times that I cannot get the full-hour break in, and I take a half.
>
> Q. So is it optional with the courier as to whether they take an hour break or a half-hour break?
>
> A. You have to have a half-hour break. It's optional if you want an hour break. With driving this much, I get tired, so I like to pull over and rest. It's [a] long, long day.

(Doc. 61-5 at 12-13) (Kolinich deposition testimony). Similarly, although Plaintiff contends that other drivers drove through their breaks, Mr. Kolinich's deposition testimony which he cites in support of this contention is to the contrary. *See* Doc. 61-5 at 7 ("I've always told [co-workers], when [Defendant] tells you to take an hour, take an hour.").

Defendant admits that couriers carried PowerPad devices with GPS technology but maintains that when other couriers drove through their breaks, they were not disciplined because they notified their managers in advance and were granted permission to do so. It notes that Plaintiff testified in his deposition that he frequently logged a break even on days when he did not in fact take a break. (Doc. 52-1 at 4, ¶ 76.) Defendant cites Plaintiff's deposition testimony that, although he believed other couriers did not receive OLCCs for not taking a full sixty-minute break, those were "isolated instances" rather

than "a repetitive thing where the [] management looked the other way." (Doc. 52-3 at 28.)

Although Defendant concedes on occasion couriers drove through their breaks without compensation, these couriers do not claim they were disciplined for doing so. Defendant further asserts that there is no evidence that couriers were disciplined for not finishing their routes. As Mr. Kolinich testified:

> Q. . . . Isn't there a penalty to the courier if that [failure to complete a route] happens?
>
> A. No. You just have to call your manager and tell them ahead of time what – how many you're going to bring back in. You're not held against it.
>
> Q. So there's no penalty at all if the courier doesn't make his, uh, all of his deliveries by seven [p.m.]?
>
> A. If he has a reason to. I mean, if I just went and sat out and didn't do anything, yeah; but if you're delivering and maintaining your stops, it's very reasonable that you can't get it all done, and this is now during COVID.

(Doc. 61-5 at 10-11.)

Plaintiff contends that the allegations in the May 2019 Warning Letter he received were inaccurate and unfair, and that Defendant did not follow its internal procedures in reviewing his appeal. He asserts that Defendant assigned him additional work that it knew he could not complete, then penalized him for failing to complete it. Defendant disagrees and states that Plaintiff notified his manager of a dental appointment after being assigned additional deliveries, did not complete all of the deliveries, and left his shift early without permission. Plaintiff did not rebut this contention.

Although Plaintiff was aware that federal law required "DOT drivers" who have worked more than eight consecutive hours to take a thirty-minute break, he asserts that he was a non-Commercial Driver's License driver limited to driving within a 150-mile radius of the BTVA station and thus that under 49 C.F.R. § 395.1(e)(1) he was exempt from the federal thirty-minute break requirement. (Doc. 61-1 at 5, ¶ 67.) Defendant counters that Plaintiff "worked as Permanent Full Time Courier (DOT)" and denies that he was exempt. (Doc. 63-1 at 1, ¶ 67.)

9

While Plaintiff admits that Defendant issued him eighteen OLCCs for violating the break policy between January 2019 and August 2019, he denies receiving all of those OLCCs. Plaintiff does not specify the number of OLCCs he actually received.

### III.    Whether the Disputed Facts Preclude Summary Judgment.

The disputed facts generally represent the parties' divergent characterization of facts that are either not disputed or not material to a determination. This type of dispute does not preclude summary judgment. *See Warren v. City of Birmingham*, 2012 WL 8719054, at *1 n.5 (N.D. Ala. Jan. 17, 2012), *report & recommendation adopted sub nom. Warren v. City of Birmingham, Ala.*, 2013 WL 3994532 (N.D. Ala. July 31, 2013) (adopting fact proffered by defendant where "[t]his fact [was] disputed by the plaintiff, without citation to the record, stating only, 'disputed as to characterization[]'" but "[t]he plaintiff [did] not explain what is wrong with the characterization").

While the parties dispute whether Plaintiff's position qualified him for a "short-haul" exemption from the federal requirement, he does not contend that Defendant's break policy was unlawful. *See* Doc. 52-3 at 25 ("Q. Okay. And so you would agree with me that the FedEx requirement that a 60-minute break be taken is not illegal, is it? A. Illegal, no. Unethical, that's another question."). Whether Plaintiff is exempt is not material because he concedes he was subject to Defendant's break policy and that he read Defendant's Employee Handbook requiring him to "comply with guidelines established in the Company's policies, rules, regulations, and procedures." (Doc. 60 at 2, ¶ 4.) He admits he repeatedly violated Defendant's break policy thereafter. *See Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) ("A fact is 'material' . . . [only] if it 'might affect the outcome of the suit under the governing law.'").

To the extent Plaintiff characterizes various warning letters as "retaliatory," this is a legal argument, not a disputed issue of fact. *See Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 777 (9th Cir. 2010) ("Pure legal conclusions are not admissible as factual findings. In the context of a summary judgment motion, a conclusion of law . . . does not, by itself, create a genuine issue of material fact for the obvious reason that a legal

conclusion is not a factual statement[.]"); *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (finding that a disputed issue of fact is "not satisfied by citations to the record that support legal argument rather than controvert material facts").

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).

## IV.   Conclusions of Law and Analysis.

### A.   Standard of Review.

The court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez*, 788 F.3d at 3 (quoting *Anderson*, 477 U.S. at 248). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248).

The court "constru[es] the evidence in the light most favorable to the non-moving party" and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (internal quotation marks omitted). There is no genuine dispute where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a

reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Id.* at 166-67 (internal quotation marks omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita*, 475 U.S. at 586). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). However, if the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Id.* at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Kaytor*, 609 F.3d 537 at 545 (internal quotation marks omitted).

### B. Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Retaliation Claim Under 21 V.S.A. § 348.

Plaintiff's First Amended Complaint alleges a single claim of illegal retaliation in violation of "Vermont's Fair Employment Practices Act – 21 V.S.A. Chapt. 5, Subchapters 2 & 6."[4] (Doc. 14-2 at 5.) During the court's October 27, 2022 hearing, it became clear that Plaintiff's claim is brought under 21 V.S.A. § 348, the anti-retaliation provision of Vermont's wage and hours laws, instead of under VFEPA's anti-retaliation provision found in 21 V.S.A. § 495(a)(8), as Plaintiff does not allege unlawful

---

[4] In Plaintiff's response to Defendant's motion for summary judgment, he states that he "asserts a legal claim of illegal retaliation against defendant, for its violations of Vermont's Fair Employment Practices Act [("VFEPA")] 21 V.S.A. § 348(2)." (Doc. 61 at 7.) Neither Subchapter 2 nor 21 V.S.A. § 348 are part of VFEPA.

discrimination based upon race, color, religion, national origin, sex, sexual orientation, gender identity, ancestry, place of birth, age, crime victim status, or physical or mental condition.

Vermont's wage and hour laws provide in relevant part:

(a) An employer shall not discharge or in any other manner retaliate against an employee because:

(1) the employee lodged a complaint of a violation of this subchapter;

(2) the employee has cooperated with the Commissioner in an investigation of a violation of this subchapter; or

(3) the employer believes that the employee may lodge a complaint or cooperate in an investigation of a violation of this subchapter.

21 V.S.A. § 348.

In *Mellin v. Flood Brook Union School District*, 790 A.2d 408 (Vt. 2001), the Vermont Supreme Court held that in order to withstand summary judgment, a plaintiff alleging retaliation must establish: (1) the plaintiff employee was engaged in a protected activity; (2) the defendant employer knew of that activity; (3) plaintiff suffered an adverse employment action; and (4) a causal connection exists between plaintiff's protected activity and the adverse employment action. *Id.* at 417-18. "At the prima facie case stage, the plaintiff's burden is a relatively light one." *Beckmann v. Edson Hill Manor, Inc.*, 764 A.2d 1220, 1222 (Vt. 2000) (applying the framework set forth in *Mellin* to VFEPA claims and observing that the framework is derived from the "three-step burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 [] (1973)"); *see also Carpenter v. Cent. Vt. Med. Ctr.*, 743 A.2d 592, 595 (Vt. 1999) ("Plaintiff's burden of proof in the prima facie case is minimal. . . . The Court of Appeals for the Second Circuit has repeatedly called it 'de minimis.'") (citations omitted).

Once a plaintiff establishes a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Beckmann*, 764 A.2d at 1222. If the defendant sustains this burden, the plaintiff must prove by a

13

preponderance of the evidence that the purported reason was a pretext for retaliation. *Id.* (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)). In a retaliation claim, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Robertson v. Mylan Lab'ys, Inc.*, 2004 VT 15, ¶ 18, 176 Vt. 356, 364, 848 A.2d 310, 319 (citing *Burdine*, 450 U.S. at 253).

Defendant contends that Plaintiff fails to establish a prima facie case of retaliation because filing internal Open Door Inquiries or appealing a Warning Letter were not "protected activities" under VFEPA and because no causal connection exists between those actions and Plaintiff's termination. Defendant effectively concedes that Plaintiff's wage claims constituted "protected activity" and that Plaintiff's termination was an adverse employment action. Even if Plaintiff establishes a prima facie case of retaliation, Defendant argues that it is entitled to summary judgment because Plaintiff has not established that its proffered reason for terminating Plaintiff was pretextual.

### 1. Whether Plaintiff Engaged in Protected Activity.

Vermont's wage and hour laws prohibit retaliation against an employee who has "lodged a complaint of a violation of this subchapter" or "cooperated with the Commissioner in an investigation of a violation of this subchapter." 21 V.S.A. § 348(a)(1)-(2). The parties do not dispute that Plaintiff's August 2014, February 2017, and July 2019 Wage Claims, which asserted that Defendant owed him unpaid wages, constituted protected activities for the purposes of his retaliation claim. Whether Plaintiff's internal complaints regarding Defendant's sixty-minute break policy were protected activities is a much closer question. Protected activity generally includes "action taken to protest or oppose statutorily prohibited discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (internal quotation marks omitted); *see also Castro v. Yale Univ.*, 518 F. Supp. 3d 593, 611 (D. Conn. 2021) (explaining that protected activity "includes a wide range of activities, like reporting discrimination, testifying in a proceeding, or otherwise participating in an investigation about discrimination"). Here, the alleged protected activity is Plaintiff's internal complaints

14

about Defendant's break policy. These were not directed at Defendant's failure to compensate him for working during his breaks, but instead protested Defendant's decision to *have* a break policy when couriers' routes made it difficult to both take a break and finish their routes.

Defendant argues that Plaintiff's two Open Door Inquiries and July 2019 Appeal Letter were not protected activities because they expressed Plaintiff's personal objections to the break policy instead of protesting statutorily prohibited discrimination. It cites Plaintiff's deposition testimony that "the reason why [he] wanted a shorter break was to allow [him] to get done with [his] route early." (Doc. 52-3 at 57.) Plaintiff counters that his objections to the break policy were based on "legal, ethical, and impractical reasons[,]" (Doc. 61 at 8), and in his April 2017 and July 2019 Open Door Inquiries, he asserted Defendant's sixty-minute break policy was so detrimental to couriers that it "tend[ed] to violate the spirit–if not the letter–of Vermont's law" requiring "reasonable opportunities to eat and to use toilet facilities in order to protect the health and hygiene of the employee." (Docs. 52-15 at 1-2, 52-22 at 1-2) (quoting 21 V.S.A. § 304) (internal quotation marks omitted). In his July 2019 Appeal Letter, he cited 12 V.S.A. § 304 and stated: "Clearly, breaks are purposed by Vermont law for the employees' benefit (i.e., health and hygiene), not for the benefit of employers as a means to coerce productivity & efficiency (i.e., increase profit), circumvent compensation, or manipulate the statistical data of reports." (Doc. 61-29 at 2.)

"A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (internal quotation marks and alteration omitted); *see also Benn v. City of New York*, 482 F. App'x 637, 639 (2d Cir. 2012) (holding that a teacher's complaints to supervisors regarding his curriculum and responsibilities "could not reasonably have been understood to protest statutorily prohibited discrimination"). Although the Vermont Supreme Court has not considered the scope of protected activity for a § 348 retaliation

claim, courts have found that "[a]n employee need not know the specific law being violated to engage in protected activity for a retaliation claim" brought under analogous employment laws. *Cole v. Foxmar*, 2021 WL 5178822, at *11 (D. Vt. Mar. 8, 2021) (finding that the plaintiff's admission that he did not know that he was complaining of violations of the Vermont Occupational Safety and Health Act or Vermont Earned Sick Time Act was "not fatal to his claim") (internal quotation marks omitted); *see also Rodriguez v. AmericanWest Bank*, 2017 WL 6549913, at *3 (C.D. Cal. Sept. 20, 2017) (finding that "[i]t is enough . . . that the employee's stated concerns at least approximate the basic elements of a legitimate claim of law-breaking"); *Breaux v. Rosemont Realty*, 2018 WL 3235416, at *12 (W.D. La. July 2, 2018) ("An employee is not required to know specifically which law is being violated as long as the employee acts in good faith and reasonably believes there is a violation.").

The relevant question is whether Plaintiff had a good-faith belief that Defendant's break policy violated Vermont's wage and hours laws. *See Cole*, 2021 WL 517882, at *12 ("For retaliation claims [under VOSHA], the 'relevant question is whether Plaintiff had a good-faith belief that [the actual working conditions] created a hazardous safety . . . condition.'") (second alteration in original) (quoting *Niedziejko v. Del. & Hudson Ry. Co.*, 2019 WL 1386047, at *37 (N.D.N.Y. Mar. 27, 2019)). Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, Plaintiff could rationally believe that Defendant's break policy violated Vermont's wage and hour laws because Defendant was aware that Plaintiff was repeatedly driving through his breaks without compensation not only through Plaintiff's wage and hour claims, but through his internal complaints. At the prima facie stage, Plaintiff has carried his burden of establishing that he engaged in protected activity prior to his termination.

### 2.     Whether Plaintiff Has Established a Causal Connection.

A plaintiff bringing a retaliation claim "may establish a link indirectly by showing that the timing of the complaint and the retaliatory action was suspect." *Gallipo v. City of Rutland*, 656 A.2d 635, 642 (Vt. 1994) (citing *In re McCort*, 650 A.2d 504, 512 (Vt.

16

1994)); *see also Crowley v. Burlington Elec. Dep't*, 992 F. Supp. 2d 370, 380 (D. Vt. 2014) ("Timing alone can be enough to establish a *prima facie* case of a causal connection."). Defendant asserts that the temporal proximity between Plaintiff's July 2019 Wage Claim and his termination in mid-September 2019 does not establish a retaliation claim.

Although no bright-line rule exists, the Second Circuit has found time periods ranging from several weeks to several months sufficient to support an inference of causal connection at the prima facie case stage. *See, e.g., Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015) (holding complaint "plausibly allege[d] a temporal proximity" for adverse actions taken two to three months after each of the plaintiff's protected activities); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) ("This temporal proximity [of four months elapsing between events] is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion.").[5]

In this case, Plaintiff filed his August 2014 and February 2017 Wage Claims more than two and as much as five years before his final Warning Letter and termination on September 13, 2019. These protected activities are too far removed from his termination to support a causal connection based on timing alone. *See Burkybile v. Bd. of Educ. of*

---

[5] The Third Circuit has recognized that "[i]n certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007), *as amended* (Aug. 28, 2007). It has, however, explained:

> Conversely, however, "[t]he mere passage of time is not legally conclusive proof against retaliation." *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir.1993) (citation omitted). Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole.

*Id.* (citations omitted).

17

*Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005) (holding a delay of one year between the plaintiff's protected activity and the adverse employment action was too long to support a finding of causation); *Robertson*, 2004 VT 15, ¶ 47, 176 Vt. at 378, 848 A.2d at 329 (finding causal relationship was not established where "plaintiff's termination came nearly seven months after she filed the current lawsuit, and over one and a half years after she filed the original claims of discrimination"). In contrast, approximately six weeks elapsed between Plaintiff's July 2019 Wage Claim and his termination. Under Second Circuit precedent, this suffices to establish a prima facie causal connection between Plaintiff's protected activity and the subsequent adverse employment action of his termination.

Defendant argues that notwithstanding temporal proximity, Plaintiff's disciplinary history prior to his protected activity rebuts any inference of causation. The Second Circuit has held that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). The Vermont Supreme Court has correspondingly found that a *lack* of disciplinary measures preceding the protected activity may rebut an inference of retaliation. *See Gallipo*, 656 A.2d at 642 ("But more significant [than the timing of the adverse employment action], in our view, is the fact that plaintiff had had no 'detail' assignments in at least ten years, nor had he received any disciplinary memoranda[] in twenty-six years until *after* he had filed a complaint with the Attorney General.") (emphasis in original); *see also Crowley v. Burlington Elec. Dep't*, 992 F. Supp. 2d 370, 380 (D. Vt. 2014) (citing Vermont law and holding "[b]ecause Crowley was terminated immediately upon her return from FMLA leave, while she intended to seek further full- or part-time leave, and without any discipline prior to the time she filed for leave, a causal connection may be inferred, thereby establishing a *prima facie* case").

Prior to filing the July 2019 Wage Claim, Plaintiff had a history of being disciplined for violating Defendant's break policy and other infractions. He received

OLCCs for failing to take a thirty-minute break as early as July and August 2013, March 2014, and March 2015, and a Warning Letter and "counseling" in November 2017 for violating the sixty-minute break policy. From January 2019 through April 2019, Defendant issued him four OLCCs for break policy violations. On May 20, 2019, Plaintiff received a Warning Letter for failing to work as directed. Five weeks later, on July 2, 2019, he received a Performance Reminder/Decision Day, which Defendant later modified to a Warning Letter for violating the break policy. During the month of July 2019, Defendant issued Plaintiff seven OLCCs for break policy violations. Although Plaintiff also received positive job performance evaluations, he was the subject of an escalating series of disciplinary measures well before he filed his July 2019 Wage Claim and well before he engaged in any protected activity.

Where termination is the "'ultimate product' of 'an extensive period of progressive discipline' which began" prior to the protected activity, no inference of retaliation may be found. *Slattery*, 248 F.3d at 96. Although an inference of retaliation is arguably rebutted in this case, Plaintiff cites evidence that Defendant was generally opposed to Plaintiff's complaints about the break policy, was aware of Plaintiff's working through his break, knew that Plaintiff was falsely claiming that he took a break, and yet did not terminate him until shortly after his July 2019 Wage Claim. Viewing this evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, at the prima facie stage Plaintiff has sustained his burden of establishing a causal connection between his protected activity and his termination.

### 3.    Whether Defendant Had a Legitimate, Nondiscriminatory Reason for Termination and Whether Plaintiff Has Established Evidence of Pretext.

Once a plaintiff has established a prima facie case of retaliation, a defendant must proffer a legitimate, non-discriminatory reason for the plaintiff's termination. *See Gates v. Mack Molding Co.*, 2022 VT 24, ¶ 39, 279 A.3d 656, 670. Defendant points out that it terminated Plaintiff's at-will employment after he received three Warning Letters within a twelve-month period following a lengthy process of discipline that predated Plaintiff's

protected activity. These facts are uncontested. Defendant has therefore carried its burden of establishing a legitimate, non-discriminatory reason for Plaintiff's termination, shifting the burden back to Plaintiff to proffer admissible evidence "that the [defendant's] reasons for [its] actions are a pretext for [retaliation]." *Mellin*, 790 A.2d at 418.

A plaintiff bringing a retaliation claim must show that "retaliation was a but-for cause of the adverse action . . . [h]owever, but-for causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845-56 (2d Cir. 2013) (footnote omitted); *see also Gauthier v. Keurig Green Mountain, Inc.*, 2015 VT 108, ¶ 22, 200 Vt. 125, 138, 129 A.3d 108, 118 (holding that plaintiff "must adduce enough evidence . . . so that a rational fact finder can conclude that the adverse job action was more probably than not caused by [retaliation]"). "A plaintiff can carry this burden 'by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.'" *Gauthier*, 2015 VT 108, ¶ 22, 200 Vt. at 138, 129 A.3d at 118 (quoting *Zann Kwan*, 737 F.3d at 846).

Plaintiff argues that the brief passage of the time between his protected activity and his termination is sufficient to establish that Defendant's purported reason for the termination was pretextual. It is not. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("[W]ithout more, . . . temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.").

Plaintiff alternatively contends that Defendant, knowing that its break policy was "untenable" due to the difficulties posed by rural delivery routes, "capriciously implemented and changed" the policy and was aware that "many" couriers disregarded the policy but did not discipline or terminate those couriers for break policy violations. (Doc. 61 at 3.) As there is no evidence to support Plaintiff's claim that any other courier who repeatedly violated the break policy escaped discipline, Plaintiff's conjecture on this issue does not create a disputed issue of material fact. *See Davis v. Bombardier Transp.*

*Holdings (USA) Inc.*, 794 F.3d 266, 269 n.5 (2d Cir. 2015) ("Mere speculation and conjecture is insufficient to preclude the granting of summary judgment.") (alterations adopted) (internal quotation marks omitted) (quoting *Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)). Despite providing the names of four couriers whom he believed did not receive OLCCs after failing to take a sixty-minute break, Plaintiff cites no evidence they failed to seek advance permission from management prior to doing so. In his own deposition testimony, he characterized these as "isolated instances" rather than "a repetitive thing where the [] management looked the other way." (Doc. 52-3 at 28.) In this respect, the other couriers are not similarly situated to Plaintiff and do not provide evidence of pretext. *See Gates*, 2022 VT 24, ¶ 54, 279 A.3d at 676 (finding that plaintiff failed to "proffer[] evidence that her employer applied its leave policy less favorably to her than to her replacement under the same circumstances"); *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 8 (2d Cir. 2017) ("We conclude that [plaintiff] cannot rely on allegations of disparate treatment to support his retaliation claim because he has failed to show that he and [his colleague] are sufficient comparators when it comes to their actions of insubordination[.]"). Plaintiff has thus "adduced no evidence . . . of how defendant applied its [break] policy to others" in similar circumstances. *Gates*, 2022 VT 24, ¶ 54, 279 A.3d at 676 (affirming summary judgment for defendant employer where plaintiff proffered no evidence that defendant applied its leave-of-absence policy differently to similarly situated employees).

In summary, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847 (collecting cases). Plaintiff has admitted that he consistently violated Defendant's break policy and was disciplined for it well before his protected activity. *See Gonzalez v. NYU Langone Hosps.*, 2022 WL 4372199, at *1 (2d Cir. 2022) (finding that despite "temporal proximity" the plaintiff's "extensive history of performance issues and ongoing discipline . . . prevent her from establishing an indirect causal connection") (internal quotation marks omitted) (citing *Slattery*, 248 F.3d at 95). By the time Defendant terminated Plaintiff's employment in September 2019, Defendant had repeatedly warned Plaintiff that his continued disregard

21

of Defendant's break policy could and would result in his termination. Thereafter, Plaintiff decided to continue to violate Defendant's break policy with full knowledge that his employment was at stake.

Plaintiff cites no discrepancies or inconsistencies in Defendant's reason for his termination. Without evidence that Defendant treated similarly situated couriers more favorably, a rational juror could not conclude that Defendant's reason for Plaintiff's termination was pretextual. *See Windish v. Buckingham Twp.*, 2023 WL 1475083, at *7 (E.D. Pa. Feb. 2, 2023) (holding "[n]o reasonable jury" could find pretext where plaintiff could not "point[] to [any] evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action") (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. 52) is GRANTED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _21st_ day of April, 2023.

Christina Reiss, District Judge
United States District Court